UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHARLES E. PRATT,<br><br>   Petitioner,<br><br> v.<br><br>SCOTT KERNAN, Warden,<br><br>   Respondent.<br>_____/ | No. C 05-2062 SI (PR)<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS** |

## INTRODUCTION

  This matter is now before the court for consideration of the merits of Charles E. Pratt's pro se petition for writ of habeas corpus concerning his 2002 conviction in the Alameda County Superior Court. For the reasons discussed below, the petition will be denied on the merits.

## BACKGROUND

A.  Case History

  Pratt was convicted by a jury in Alameda County Superior Court of two counts of robbery. See Cal. Penal Code § 211. He admitted he had suffered three prior convictions, one prior strike conviction and two prior felony convictions. Pratt was sentenced to 19 years in state prison.

Pratt appealed. The California Court of Appeal affirmed the conviction. The California Supreme Court denied review.

Pratt filed state habeas petitions. The petitions were denied by the Alameda County Superior Court, the California Court of Appeal and the California Supreme Court.

Pratt then filed this action seeking a writ of habeas corpus. The court ordered the respondent to show cause why the writ should not be issued. Respondent filed an answer and Pratt filed a traverse. The matter is now ready for consideration on the merits.

B.   The Crime

The California Court of Appeal described the crimes:

### Robbery of Vuksinich

At about 7:45 p.m. on December 31, 2001, 17-year-old Vuksinich was en route to a party. He stopped at a store where he bought beer using a California driver's license issued to Brian Jenkins. After putting the Jenkins license in his wallet, Vuksinich continued walking. A slow-moving, big, red American car "full of people" came up behind him. Vuksinich heard the car door shut and someone approach him. Vuksinich turned around and saw defendant coming toward him. Defendant, wearing dark clothes and a beanie hat, repeatedly demanded that Vuksinich give him his wallet and money. As Vuksinich backed away, defendant hit him in the head with a closed fist, knocking him down. Vuksinich cut his hand on a beer bottle, which had broken. As Vuksinich grappled with defendant on the ground, he realized he was being hit and kicked by more than one person. Vuksinich told his assailants where his wallet was and felt someone grab it from his pocket. The robbers fled and Vuksinich was taken to the hospital.

As Tory Corpening was getting into his car, he saw three African-American men kicking Vuksinich, who was on the ground. One of the assailants wore a beanie. After Corpening yelled, "Hey, stop," the three assailants fled in a red Oldsmobile with no rear license plate. Thereafter, Corpening saw the red Oldsmobile with the three men inside heading for the Alameda Naval Base.

### Robbery of Robin Nickerson

At about 8:00 p.m. on the night of Vuksinich's robbery, Robin Nickerson and Kelly Avery arrived at the old Alameda Naval base for a dance. While in the parking lot changing into their dance gear, a dark maroon American car, with no license plates and its lights off, pulled up. Two of the three African-American men inside the car got out and approached Nickerson and Avery. One demanded Nickerson's purse and said, "I don't want to have to shoot you." The other approached Avery. Avery came around behind Nickerson's robber, put a small penknife to the man's neck and said, "This doesn't have to go any further." A scuffle ensued and one of the men hit Nickerson in the face. The two robbers then fled in the car.

2

Alameda Police Sergeant Kevin McNiff set up a perimeter around the old Navy base. At about 8:27 p.m., he saw a maroon Oldsmobile with no license plates and three African-American males inside. A high-speed chase ensued. The Oldsmobile slowed down and the driver and front passenger jumped out and fled. The Oldsmobile, in which defendant was ducking down in the back seat, then crashed into a pole. Defendant was taken into custody. Human bloodstains were found on his clothes.

Sergeant McNiff noticed the steering column of the Oldsmobile had been broken apart and the car appeared to be "hot wired." The driver's license issued to Brian Jenkins and a black beanie were found on the front passenger seat. McNiff requested that an officer contact the Oldsmobile's registered owner to determine if it was stolen and to take a stolen auto report from the registered owner. James Seay, the Oldsmobile's owner, said the Oldsmobile was stolen several days before the subject robberies, and the Jenkins license was not inside the car before it was stolen. According to investigating Detective Edward Jaime, stolen cars are typically used during robberies to help conceal the robber's identity when fleeing the scene.

Police transported Vuksinich to the location of the crashed Oldsmobile for a field identification. Vuksinich identified the Oldsmobile as the car involved in his robbery and said he was 70 percent sure that defendant was the person who initially approached and attacked him. Ten days later, Vuksinich identified defendant from a photo lineup and told police he was positive that defendant had robbed him. Vuksinich also identified defendant in court as the robber.

Nickerson and Avery were transported separately to the crashed Oldsmobile for a field identification. They each identified the Oldsmobile as the car involved in their robbery, but were unable to identify defendant as Nickerson's assailant. Subsequently, Nickerson and Avery were shown two photo lineups. They were unable to identify anyone from the first photo lineup. In the second lineup, Nickerson identified [Kevin] McGhee, the driver of the Oldsmobile, as the person who struck her during the robbery. She was unable to identify the defendant in court as one of the robbers.

Cal. Ct. App. Opinion, 1-3.

In his petition, Pratt makes four claims. First, he claims that he received ineffective assistance of counsel in that counsel failed to have blood evidence tested and failed to investigate witness Catherine Wolf in a reasonable and timely manner. Second, Pratt claims that the trial court violated his right to due process by denying a request for a continuance so that he could produce witness Catherine Wolf. Third, Pratt claims that the prosecutor engaged in misconduct by misstating facts in violation of Pratt's right to a fair trial. Fourth, Pratt claims his sentence violates due process and exceeds that allowed by state law because the prior conviction was not for a "serious" or "violent" felony that could be counted under the Three Strikes Law.

3

## JURISDICTION AND VENUE

This court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. § 2254. 28 U.S.C. § 1331. This action is in the proper venue because the challenged conviction occurred in Alameda County, California, within this judicial district. 28 U.S.C. §§ 84, 2241(d).

## EXHAUSTION

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. See 28 U.S.C. § 2254(b), (c). Pratt has exhausted the ineffective assistance of counsel and prosecutorial misconduct claims. He has also exhausted his due process claim based on the trial court's denial of his motion for continuance. The due process claim based on sentencing error has not been exhausted. However, because the claim is not even colorable, relief is denied on the merits. See Cassett v. Stewart, 406 F.3d 614, 623-24 (9th Cir. 2005).

## STANDARD OF REVIEW

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

**DISCUSSION**

A.   Assistance Of Counsel

Pratt contends that he received ineffective assistance from his trial counsel when counsel failed to have DNA blood tests performed on Pratt's clothing, and failed to investigate witness Catherine Wolf in a reasonable and timely manner.

The Sixth Amendment to the U.S. Constitution guarantees not only assistance, but effective assistance, of counsel. See Strickland v. Washington, 466 U.S. 668, 686 (1984). The purpose of the right is to ensure a fair trial, and the benchmark for judging any claim of ineffectiveness is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result." Id. To prevail on an ineffective assistance of counsel claim, a habeas petitioner must show that (1) counsel's performance was "deficient," i.e., his "representation fell below an objective standard of reasonableness" under prevailing professional norms, id. at 687-88, and (2) prejudice flowed from counsel's performance, i.e., that there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different, see id. at 691-94. The relevant inquiry under Strickland is not what defense counsel could have done, but rather whether his choices were reasonable. See Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir. 1998), cert. denied, 525 U.S. 1159 (1999). Judicial scrutiny of counsel's performance must be highly deferential, and a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. See Strickland, 466 U.S. at 689; Wildman v. Johnson, 261 F.3d 832, 838 (9th Cir. 2001); Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir. 1994).

   1.   Failure To DNA Test Petitioner's Clothing

Pratt claims that defense counsel was ineffective for failing to have DNA tests performed on the clothing that he was wearing on the night of the robberies. Pratt asserts that defense counsel should have insisted that DNA tests be performed in order to "conclusively show[] that the blood evidence found on petitioner's clothing [] was not that of the victim's, Micheal

Vuksinich." Petition at A-4.

Counsel's decision not to have DNA testing performed was a tactical decision. Tactical decisions of trial counsel deserve deference when: (1) counsel in fact bases trial conduct on strategic considerations; (2) counsel makes an informed decision based upon investigation; and (3) the decision appears reasonable under the circumstances. See Sanders, 21 F.3d at 1456.

Counsel made a tactical decision to argue for the complete exclusion of the blood evidence on the grounds that the evidence was more prejudicial than probative under the balancing test in California Evidence Code § 352, instead of having a DNA test performed. See RT 24-28, 333-38. In his motion to exclude the evidence, counsel argued that the evidence would cause the jury to infer that the blood on Pratt's clothing was Vuksinich's. Such an inference, he argued, was unfairly prejudicial when there was no DNA evidence to support it. The fact that the blood had not been tested was an essential component of his prejudice argument, i.e., the jury might make unfair assumptions in the absence of conclusive results on the blood. Defense counsel could not have argued for the exclusion of blood evidence if he had taken steps to have it tested because testing would indicate its perceived relevance. If the blood was tested and matched Vuksinich's, it would be fatal to the defense, and the probative value would be greatly increased. Therefore, counsel had to choose between testing the blood, and risking a very bad result, or not pursuing the test and arguing to keep it out under § 352. The downside of the chosen strategy, i.e., losing the motion, was less severe than the downside of the alternative strategy, i.e., confirming that the blood on Pratt's clothing was Vuksinich's, which would undermine the mistaken identity defense.

Counsel's decision was also informed. During his § 352 argument, counsel said "I've told Mr Pratt . . . you live or you die by the [DNA] test. . . . [I]f it comes back that the human blood on these garments and so forth is yours, then there's not much for the defense to argue on that point. On the other hand, if it's not his blood, that takes us to another issue which is going toward the innocence of Mr. Pratt." RT 335. These statements show that counsel knew he was foregoing the potential benefit of gaining evidence that would have helped to establish innocence in order to avoid the possible cost of eliminating Pratt's defense and that he had discussed the

6

1 blood evidence with Pratt before he made his in limine motion to exclude it. See RT 26, 335.
2 One possible inference from counsel's statement is that both counsel and client realized the
3 blood would match Vuksinich's if DNA testing was done, so a different strategy was chosen.
4       Counsel's decision was reasonable under the circumstances. Counsel made the decision
5 regarding DNA testing in light of strong circumstantial evidence of guilt. See e.g., RT 43-95,
6 112-13, 134-142, 165-66, 230-35, 250-56. Counsel reasonably decided that the risk of pursuing
7 a DNA test was too high. Even under the best of circumstances, the test would not exonerate
8 Pratt. Pratt could have committed the robbery without getting any of Vuksinich's blood on him.
9 Instead of pursuing the risky strategy that Pratt now advocates, counsel reasonably argued for
10 the exclusion of the blood evidence and used the prosecution's lack of a DNA match to Pratt's
11 advantage in his closing argument that emphasized the mistaken identity theory and the
12 prosecution's failure to do the DNA testing. See RT 503-05. Counsel's informed weighing of
13 the benefits versus the risks of pursing the test is entitled to deference. The state court's
14 summary rejection of this ineffective assistance of counsel claim was not unreasonable.[1]

16     2.    Failure To Investigate Catherine Wolf
17 Pratt claims that counsel was ineffective for failing to investigate potential witness
18 Catherine Wolf in a reasonable and timely manner. Pratt asserts that counsel's investigation of
19 Catherine Wolf was not undertaken until after Officer Jaime's testimony at trial, and that counsel
20 should have done so much earlier.[2] Defense counsel employed an investigator to locate

---

22 [1]The Alameda County Superior Court rejected Pratt's habeas petition in a four-sentence order.
23 See Resp. Exh. 6, unnumbered attachment. The state appellate and supreme courts rejected Pratt's habeas petition without comment.

24 [2]The California Court of Appeal described Jaime's testimony about Wolf's statement as follows:
25 "Jaime had testified that Wolf lived near the scene of the Vuksinich robbery, and he interviewed her and showed her two photo lineups following that robbery." Cal. Ct. App. Opinion, 6. Petitioner's Traverse,
26 in an unnumbered attachment, provides a copy of Wolf's statement to the police, which was as follows: "New Years Eve Tory and I had been at my friend Ruth Luis's house on -------. Tory went outside
27 because he was going out and started yelling that someone was getting beat in the parking lot across the street. Me and my friend Babs (Ruth) ran outside and I saw about 3 Black guys beating a white kid laying on the ground. Tory yelled at the guys and they got up and ran to a car parked on Taylor Avenue.
28 There was another Black guy seated in the driver's seat of the car. After the Black guys left we helped the kid up and called the police. The guy in the photo marked #2 looks like the same guy who I saw

7

Catherine Wolf. At some point, the investigator did locate her, and one day before the close of the prosecution's case defense counsel requested that the trial court issue a subpoena for her and grant a continuance. Pratt argues that Wolf's testimony would have been helpful because she would have testified that Pratt was not the one who knocked Vuksinich to the ground.

It was not objectively unreasonable for counsel to not investigate Catherine Wolf before trial. Aside from Pratt's bare assertions, there is nothing in the record establishing that Catherine Wolf knew who knocked down Vuksinich. According to defense counsel's statements at the motion for a continuance, Pratt formed this belief only after hearing the evidence offered at trial–presumably the testimony of Officer Jaime, who interviewed Wolf and administered photo lineups to her. If prior to trial Pratt did not believe that Wolf had information about what happened before Vuksinich was on the ground, his attorney likely did not either. Therefore, there was no reason to investigate at that point. When Pratt formed his belief about Wolf's knowledge of the incident–at trial–counsel undertook an investigation. He hired an investigator to find Wolf, and asked for a continuance. Furthermore, there is no evidence to support Pratt's belief about Wolf's knowledge. As far as the record reflects, Wolf only saw what happened after Vuksinich had been knocked to the ground and, thus, her testimony would have been duplicative of Corpening's. It was not deficient performance for counsel to fail to obtain cumulative testimony.

Pratt also cannot establish prejudice. Assuming Wolf would have testified in accordance with her statement, calling Wolf as witness would have helped to solidify the state's case by corroborating Corpening's version of the incident, rather than assisting the defense. Moreover, it does not matter who actually knocked Vuksinich down, since, according to Vuksinich, all three men subsequently participated in the beating and robbery. Pratt argues that Wolf did not identify him (Pratt) in the photo line-up and instead identified Kevin McGhee as the assailant she saw kicking the victim. That's true, but of limited relevance. Wolf's statement to police that was

---

hitting the kid on the ground. He ran to the car and got into the right front passenger's seat when it took off." Tory was the first name of witness Tory Corpening, her ex-husband. The man in photo #2 was Kevin McGhee.

expected to be repeated at trial showed that (1) she did not see who initially knocked the victim to the ground, (2) she emerged from a house to see the beating only after hearing Tory Corpening yelling that it was occurring outside and across the street, and (3) she saw three men beating the victim. The fact that Wolf identified only McGhee did not exonerate Pratt because this was not a case with a single perpetrator, i.e., it did not have to be McGhee or Pratt, and it could have been McGhee and Pratt among the three attackers. Wolf's statement clearly shows she did not see the beginning of the incident, so that even if she could testify that she did not see Pratt punch Vuksinich in the face and cause him to fall to the ground, it would not advance the defense theory because there is no evidence that she saw someone else do it. Her anticipated testimony was not inconsistent with Vuksinich's statement identifying Pratt as the initial assailant. While Pratt tries to make much of an alleged inconsistency between the statements of Corpening and Wolf, he ignores the fact that the statements of victim Vuksinich and Wolf jibed: Vuksinich testified that he initially was hit by Pratt and Wolf saw the attack later in its progress when another assailant had been inflicting his blows. The foregoing shows that no prejudice resulted from not investigating obtaining Wolf's testimony before trial. The California court's summary rejection of the claim was not contrary to, or an unreasonable application of clearly established federal law.

B.  <u>The Trial Court's Denial Of Pratt's Motion To Continue Did Not Violate Due Process</u>

Pratt claims that the trial court abused its discretion and denied his right to due process by refusing to grant his motion to continue the trial so that he could subpoena potential witness Catherine Wolf.

The state court of appeal rejected the argument that the trial court's denial of the requested continuance was an abuse of discretion under state law. The appellate court noted that the request was tardy, and no showing was made of earlier efforts to locate the witness. Cal. Ct. App. Opinion, p. 7. "In addition, as the prosecution noted, no offer of proof was made that Wolf was at the Vuksinich robbery scene from the beginning. Consequently, her proffered testimony was cumulative to that of witness Corpening." <u>Id.</u>

9

> The matter of a continuance is traditionally within the discretion of the trial judge, and it is not every denial of a request for more time that violates due process even if the party fails to offer evidence or is compelled to defend without counsel. Contrariwise, a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality. There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the judge at the time the request is denied.

Ungar v. Sarafite, 376 U.S. 575, 589 (1964) (citations omitted). Additionally, even if the continuance was improperly denied, habeas relief is not available unless there is a showing of actual prejudice to petitioner's defense resulting from the refusal to grant a continuance. See Gallego v. McDaniel, 124 F.3d 1065, 1072 (9th Cir. 1997).

Under the circumstances present in Pratt's case, no constitutional violation occurred when the trial court refused to permit a continuance to subpoena and bring Catherine Wolf to testify at trial. The same reasoning that shows no constitutional error also shows that the refusal to allow the continuance did not result in any actual prejudice, i.e., the substance of Wolf's anticipated testimony was not going to strengthen the defense. Defense counsel told the trial court that he expected Wolf to testify that she saw Kevin McGhee hitting Vuksinich. He asserted that Wolf's identification of McGhee would help establish the mistaken identity defense and contradict Vuksinich's testimony that Pratt was the one who struck him and knocked him to the ground. However, Wolf's identification of McGhee would not exonerate Pratt. Wolf saw three men hitting Vuksinich. Even with her identification of McGhee, Pratt still could have been one of the other two men. Additionally, there was not a conflict between Wolf's statement and Vuksinich's. Vuksinich testified that Pratt knocked him to the ground and hit him. Wolf's testimony would not be to the contrary because she did not see the commencement of the attack. Nor would she testify that Pratt could not have been one of people hitting Vuksinich. The statements of defense counsel and the prosecutor support respondent's assertion that Wolf only observed what happened <u>after</u> Vuksinich was on the ground, and therefore, Wolf's testimony would be merely duplicative of Corpening, who already testified about what happened after Vuksinich was on the ground. The denial of the motion to continue did not violate Pratt's due process rights and he has not shown actual prejudice from the denial of the continuance. He is

not entitled to the writ on this claim.

C.   Prosecutorial Misconduct Claim

Pratt claims that the prosecutor committed misconduct in his opening statement when he said that the evidence would show that Pratt was guilty of robbing Robin Nickerson. Pratt asserts that there was insufficient evidence to support the verdict against him in the Nickerson robbery, and therefore, the prosecutor's false statement must be the only reason the jury convicted him.[3]

A defendant's due process rights are violated when a prosecutor's misconduct renders a trial "fundamentally unfair." Darden v. Wainwright, 477 U.S. 168, 181 (1986). Claims of prosecutorial misconduct are reviewed "'on the merits, examining the entire proceedings to determine whether the prosecutor's [conduct] so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Johnson v. Sublett, 63 F.3d 926, 929 (9th Cir. 1995). In addition, federal habeas relief is appropriate only if error of constitutional magnitude had a substantial and injurious effect or influence in determining the jury's verdict. See Brecht v. Abrahamson, 507 U.S. 619, 637 (1993); see, e.g., Johnson v. Sublett, 63 F.3d at 930 (finding prosecutorial vouching "could not have had substantial impact on the verdict necessary to establish reversible constitutional error" under Brecht). Remarks in an opening or closing statement could be so prejudicial to support a finding of constitutional error. Frazier v. Cupp, 394 U.S. 731, 736 (1969). But there is no such error where the prosecutor gives an "objective

---

[3]When the court initially reviewed Pratt's petition, it identified an insufficiency of the evidence claim as a separate claim from the prosecutorial misconduct claim even though the insufficiency of the evidence argument was made within the prosecutorial misconduct claim. Neither respondent in his answer nor petitioner in his traverse addressed any insufficiency claim. Upon a closer reading of the petition, the court now sees that Pratt's statement that the evidence was insufficient was not a separate claim, but was instead an argument in support of his claim that the prosecutor engaged in misconduct. Specifically, he contends that, since there was insufficient evidence to support charging him, trying him, or the jury's guilty verdict, the verdict must have been due to "the prosecution's negligence and perjury." See Petition, p. C-5; see also id. at C-6 ("The intentionally false statement made by the prosecution is the only thing that the jury could of [sic] have drawn its conclusion of petitioner's guilt from, because as you can see from all documentation, testimony, and all other autherity's [sic] there wasn't anything else to support the prosecution's case of petitioner's guilty beyond a reasonable doubt in this charge/case.")

11

summary of evidence which the prosecutor reasonably expected to produce," even if events at trial prevent the prosecutor from actually presenting that evidence. Id.

In his opening statement, the prosecutor told the jury that Robin Nickerson and Kelly Avery were robbed by two men who got into a car and drove off, and that the police subsequently stopped a car fitting Nickerson's and Avery's description and that Pratt was found in the backseat. At trial, the prosecutor presented testimony from Avery and Nickerson who both said they were robbed by two men who got in a car with no license plates and drove off. RT 230-35, 250-56. They later identified the car in Alameda. Id. Therefore, the challenged statement was directly supported by the evidence produced at trial. The statement was not improper. The challenged statement was no more than an objective summary of the evidence which the prosecutor reasonably expected to produce and the prosecutor did in fact produce the supporting evidence. The California courts summarily denied this claim. That rejection was not contrary to, or involved an unreasonable application of, clearly established federal law. See 28 U.S.C. § 2254(d). Pratt is not entitled to the writ on this claim.

D.  Sentencing Error

Pratt claims that his sentence violates due process because the trial court used a 1992 prior felony conviction to enhance his sentence in excess of what was allowed by state law. Pratt contends that his 1992 conviction is not a "serious" or "violent" felony that could justify sentencing enhancement under California Penal Code §§ 1192.7, 1170.12 or 667. This claim has not been exhausted. However, because it is not even colorable, relief is denied on the merits.

Pratt states that his 1992 conviction was for "theft," not robbery, but the record clearly reflects that his only conviction in 1992 was for robbery, under California Penal Code § 211, and he admitted he had suffered the second degree robbery conviction. See CT 72, 204; RT 520-21. Whether the prior felony conviction qualifies as a "serious" or "violent" felony is a matter of state law. Miller v. Vasquez, 868 F.2d 1116, 1118-19 (9th Cir 1989). The plain language of § 1192.7(c)(19) defines robbery as a "serious" felony. Because Pratt was not sentenced in excess of that which was allowed by state law, this claim is not cognizable on federal habeas. See

12

Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (state law violations not cognizable on habeas).

**CONCLUSION**

For the foregoing reasons, the petition for writ of habeas corpus is DENIED on the merits. The clerk shall close the file.

IT IS SO ORDERED.

DATED: January 19, 2007

_____
SUSAN ILLSTON
United States District Judge